**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**

CASE NO.: 1:22-cv-313

MSP RECOVERY CLAIMS, SERIES LLC,
a Delaware entity,

      Plaintiff,

v.

EXACTECH, INC., and EXACTECH US, INC.,

      Defendants.

_____

## CLASS ACTION COMPLAINT FOR ECONOMIC LOSS

MSP Recovery Claims, Series LLC ("MSPRC") brings this action, individually and on behalf of all others similarly situated (the "Class Members"), against Defendants Exactech, Inc. and Exactech US, Inc., (collectively, "Exactech"), and alleges as follows:

### I.    NATURE OF THE ACTION

1.    This is an action for economic damages resulting from Defendants' development, designing, testing, assembling, manufacturing, packaging, monitoring, labeling, preparing, distributing, marketing, supplying, storing and selling of the Optetrak, Optetrak Logic, Truliant Total Knee Arthroplasty Systems ("TKA"), Vantage Total Ankle Arthroplasty System ("TAA"), and Connexion GXL Liner and conventional UHMWPE acetabular liners ("Hip Liners") (collectively the "Defective Devices").

2.    Exactech designs, tests, develops, manufactures, markets, distributes and sells orthopedic implant devices (including the Defective Devices), related surgical instrumentation, and biologic services to hospitals and physicians in the United States and internationally.

1

3.      While most hip, knee, and ankle joint replacements last for several years, Exactech's systems fail sooner and more often than others on the market.

4.      Exactech admits that many of these premature and frequent failures are a result of Exactech's improper packaging of a component part – the polyethylene insert – which exposes the part to oxygen, causing it to oxidize and ultimately deteriorate at an accelerated rate. This eventually leads to premature failure of the entire hip, knee, or ankle system.

5.      As a result of Defendants' wrongdoing, including its inadequate packaging of the Defective Devices, thousands of patients implanted with the Defective Devices have had to undergo (or will likely have to undergo) extensive revision surgeries to remove and replace the Defective Devices and repair the damage the Defective Devices caused.

6.      Class Members are third-party payors ("TTPs"), who paid for or reimbursed payment for Defendants' Defective Devices and associated harms, including the costs and expenses of revisionary procedures required as a result of Defendants' Defective Devices.

7.      Class Members seek recompense from Defendants for their payment or reimbursement for Defendants' Defective Devises and associated harms, including the costs and expenses of revisionary procedures required as a result Defendants' Defective Devices.

## II.      THE PARTIES

8.      MSPRC is a Delaware series limited liability company with its principal place of business at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134. MSPRC's limited liability company agreement provides for the establishment of one or more specific series. All records of all series are maintained together with all assets of MSPRC.

9.      Certain healthcare benefit providers have assigned their recovery rights to assert the claims alleged in this Class Action Complaint to Series LLCs of MSPRC. Pursuant to

MSPRC's limited liability agreement, all rights arising from assignments to its Series LLCs

(including the assignments discussed below), as well as the right to bring any lawsuit in

connection with such assignments (including those discussed below), belong to MSPRC. As

such, MSPRC has the right and power to sue defendants to recover the payments and damages at

issue in this action.

10.     Certain series of MSPRC have executed irrevocable assignments of any and all

rights to recover payments made on behalf of their assignors' health plan members and enrollees.

These assignments authorize a series and, in turn MSPRC through its operating agreement, to

pursue and enforce all legal rights of recovery and reimbursement for health care services and

Medicare benefits.

11.     As an example, on May 12, 2017, one of MSP's Assignors, Summacare, Inc.

("Summacare") irrevocably assigned all its rights and claims to recovery against anyone

(including defendants) for payments made on behalf of its enrollees under Medicare Parts A, B,

and D to MSP Recovery, LLC ("MSP Recovery"). The assignment states as follows:

> [Summacare] hereby irrevocably assigns, transfers, conveys, sets
> over and delivers to MSP Recovery, and any of its successors and
> assigns, any and all of [Summacare's] right, title, ownership and
> interest in and to all Claims existing on the date hereof, whether
> based in contract, tort, statutory right, and any and all rights
> (including, but not limited to, subrogation) to pursue and/or recover
> monies for [Summacare] that [Summacare] had, may have had, or
> has asserted against any party in connection with the Claims and all
> rights and claims against primary payers and/or third parties that
> may be liable to [Summacare] arising from or relating to the Claims,
> including claims under consumer protection statutes and laws, and
> all information relating thereto, all of which shall constitute the
> "Assigned Claims".

12.     On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under

the Summacare Assignment to Series 16-11-509, a designated series of MSPRC:

[Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated May 12, 2017, by and among [Summacare] . . . and [MSP Recovery] . . . .

13.    Summacare consented to, acknowledged, approved, and ratified the assignment from MSP Recovery to Series 16-11-509, which is memorialized in a letter dated September 5, 2018.

14.    Summacare paid for Defendant's Defective Devices, many of which failed due to premature wear.[1] As an example, below are some Defective devices for which Summacare paid for or made reimbursements:

| PATIENT | DATE OF SURGERY | DEFECTIVE DEVICE IMPLANTED |
|---|---|---|
| A | 1/21/15 | OPTETRAK Logic CRC Tibial Inserts |
| B | 3/21/16 | OPTETRAK Logic PS Tibial Inserts |
| B | 5/20/16 | OPTETRAK Logic PS Tibial Inserts |
| B | 11/15/18 | OPTETRAK Logic PSC Tibial Inserts |
| C | 6/21/10 | OPTETRAK CR Tibial Inserts |
| D | 7/28/11 | OPTETRAK CC Tibial Insert |
| E | 4/14/11 | OPTETRAK CC Tibial Insert, with Product Line |
| F | 10/2/14 | OPTETRAK CC Tibial Insert |
| G | 10/11/11 | OPTETRAK CC Tibial Insert |
| H | 12/23/14 | OPTETRAK CC Tibial Insert |
| I | 5/5/16 | OPTETRAK Logic PS Tibial Inserts |
| J | 10/24/16 | NOVATION GXL LINER, LIPPED, 36MM ID, GROUP 3 CUPS |
| J | 3/17/17 | NOVATION CONSTRAINED LINER 36MM ID GROUP 3 |

15.    MSP's Assignors were unaware of the defects in the Defective Devices at the time of the payments. Had MSP's Assignors been aware of the defects in the Defective Devices, they would not have paid for or reimbursed payment for Defective Devices for their enrollees.

---

[1] To be clear, MSP does not limit it claims to devices that failed due to premature wear. It sues to recover funds paid for all Defective Devices and the costs and expenses of revisionary procedures required as a result of Defendants' Defective Devices

16.     Defendant, Exactech, Inc., is a Florida corporation with its principal place of business at 2320 NW 66th Court, Gainesville, Florida 32653.

17.     Exactech, Inc. designs, tests, develops, manufactures, markets, distributes and sells orthopedic implant devices (including the Defective Devices), related surgical instrumentation and biologic services to hospitals and physicians in the United States and internationally.

18.     At all relevant times, Exactech, Inc. was engaged in promoting, distributing, selling, or otherwise introducing its products, including the Defective Devices, into interstate commerce, either directly or through third parties or related entities, and obtaining substantial revenue as a result.

19.     Defendant, Exactech US, Inc., is a wholly owned subsidiary of Exactech, Inc. with its principal place of business at 2320 NW 66th Court, Gainesville, Florida 32653.

20.     Exactech US, Inc. conducts Exactech's U.S. sales and distribution activities. Upon information and belief, the Defective Devices at issue were distributed by Exactech US, Inc. throughout the United States.

### III.    JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over the federal claim asserted herein under 28 U.S.C. § 1331. The court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. The Court further has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 2310(d) for the Magnuson-Moss Warranty claim. The Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed class is a citizen of a state different from that of Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed class consists of more than 100 class

members, and (d) none of the exceptions under this subsection apply to this action.

22.    This Court has personal jurisdiction over Defendants because both Defendants' home offices are located in Florida, Defendants have intentionally availed themselves of the benefits of doing business in Florida, and Defendants have sufficient minimum contacts in Florida, such that the exercise of personal jurisdiction by this Court is proper.

23.    Venue is proper in this District because "a substantial part of the events or omissions giving rise to the claim occurred" in this District, the Defendants reside in this District, and Defendants are subject to the personal jurisdiction of this Court.  28 U.S.C. § 1391(b)(3).

## IV.    FACTUAL BACKGROUND

24.    Exactech is a global medical device company that develops and markets orthopedic implant devices, related surgical instruments, and smart technologies to hospitals and physicians.

25.    According to Exactech's website, its purpose is and has been as follows:

> Exactech exists to help people improve their quality of life and regain their independence if they've been injured or developed arthritic disease. We do this through innovative idea, high quality products, education and commitment to service.[2]

26.    Polyethylene is a polymer of ethylene – a hydrocarbon – which consists of as many as 200,000 ethylene repeat units. Ethylene is polymerized in the presence of catalysts to make ultra-high molecular weight polyethylene ("UHMWPE"), which is commercially produced

---

[2] The Exactech Experience, https://www.exac.com/about-us/the-exactech-experience/ (last visited Aug. 29, 2022).

as resin powder. The resin powder is then consolidated into rods/sheets from which final inserts found in TKAs and TAAs are made.

27.    Polyethylene is a significant element of the Defective Devices, and its development has undergone considerable changes in the last thirty years. Although polyethylene is commonly used in the Defective Devices, there are several concerns with *in vivo* use. Specifically, polyethylene inserts cannot be exposed to oxygen during the packaging and storing process. Exposing polyethylene inserts to oxygen creates a chemical reaction called oxidization, which causes the premature wear or degradation of polyethylene inserts.[3] As such, polyethylene inserts must be handled with a high degree of care when processed, packaged, and stored.

28.    The oxidation process is time-dependent and also can occur before the liner is even implanted in a patient if the liner is exposed to air. Thus, airtight packaging is crucial and requires multiple barriers to adequately prevent oxidation.

29.    Wear characteristics of polyethylene are directly influenced by processing, storing, and packaging methods. These methods are aimed at preventing oxidation of polyethylene inserts. Proper packaging and storage prevents oxidation and reduces the risk of failure from strength changes in the polyethylene inserts and prevents improper wear from occurring.

30.    Polyethylene wear directly causes component loosening and other component failures. Thus, polyethylene wear can cause severe complications, including swelling, grinding,

---

[3] "URGENT DEAR HEALTHCARE PROFESSIONAL COMMUNICATION" Letter from Sharat Kusuma, MD, FAAOS, Exactech, Inc. Chief Med. Officer, to Surgeons, Hospitals, Health care professionals, 2 (Aug. 11, 2022), https://www.exac.com/wp-content/uploads/2022/08/US-DHCP-Letter_FINAL_8.09.2022_Hip.pdf

instability, tissue damage, osteolysis, permanent bone loss and other injuries. This ultimately causes entire systems to fail, requiring patients to undergo revision surgeries.

31.     The damage that can occur to polyethylene components when exposed to air is widely known in the medical device industry. It is common knowledge that when manufactured and stored, polyethylene components must be packaged in multi-layered, sufficiently oxygen-resistant, vacuum-sealed bags. Throughout the medical device industry, scrupulous precautions are taken to ensure that polyethylene components are properly packaged to avoid oxidation.

## A. Knee and Ankle Replacement Systems

### a. *Exactech's False and Misleading Performance Claims*

32.     Exactech represented to doctors, patients, and the general public that its knee and ankle replacement systems were "excellent," high quality, and reliable.

33.     For example, its TKA marketing materials boasted:

> With a design developing for more than four decades and excellent clinical and laboratory results, surgeons can have confidence in a knee system that continues to demonstrate performance over time. Surgeons around the world continue to document excellent long-term clinical results with the Optetrak family of products.[4]

34.     Upon information and belief, Exactech's marketing materials boasted similar "performance over time" and low revision rates.

35.     Exactech's marketing materials did not disclose several investigations regarding the polyethylene in its devices, and ongoing claims that Exactech knee, and ankle replacement systems were, in fact, failing much sooner and at much higher rates than others on the market.

---

[4] EXACTECH KNEE Performance over time, Optetrak Logic, Comprehensive Knee System (2015), https://www.exac.com/wp-content/uploads/2020/07/712-25-20_RevE_Optetrak_Logic_Brochure.pdf.

36.     By offering for sale its knee and ankle replacement systems in the United States, Exactech represented that it complied with U.S. law and current good manufacturing practices, which requires: "Each manufacturer [to] ensure that device packaging and shipping containers are designed and constructed to protect the device from alteration or damage during the customary conditions of processing, storage, handling, and distribution." 21 CFR 820.130.

37.     On information and belief, hospitals and surgeons had purchase agreements with Defendants, which required that the devices be of merchantable quality. Class Members, as ultimate purchasers of the Defective Devices, were intended or incidental third-party beneficiaries of such arrangements.

**b. *Exactech Was Aware of Problems with Its Knee and Ankle Replacement Systems, But Failed to Inform the Public***

38.     As early as 2012, Exactech knew or should have known that its knee and ankle replacement systems were failing at a higher rate than promoted due to the oxygenation of the polyethylene components.

39.     For example, adverse event reports in the Manufacturer and User Facility Device Experience (MAUDE) database in 2012 indicate instances of revision due to "loose tibial component,"[5] "aseptic loosening,"[6] "pain and visible loosening,"[7] "poly[ethylene] insert

---

[5] *See* U.S. FOOD & DRUG ADMIN., MAUDE Adverse Event Report: EXACTECH, INC. OPTETRAK LOGIC TRAP TRAY (Jan.19, 2012), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=2439629&pc=JWH.
[6] U.S. FOOD & DRUG ADMIN., MAUDE Adverse Event Report: EXACTECH, INC. OPTETRAK CONSTRAINED CONDYLAR FEMORAL COMPONENT (Jan. 11, 2012), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=2421368&pc=JWH.
[7] U.S. FOOD & DRUG ADMIN., MAUDE Adverse Event Report: EXACTECH, INC. OPTETRAK PS TIBIAL INSERT (Aug. 01, 2012), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=2703774&pc=JWH.

appeared to be worn,"[8] and "pain, limited mobility, knee swelling and sensitivity"[9] caused by loosening in the joint replacement.

40.    Additional examples from 2014 cite "revision due to tibial loosening,"[10] "tibial loosening and potential backside wear on poly[ethylene],"[11] "revision of [O]ptetrak knee components reportedly due to . . . heavy wear on the polyethylene,"[12] "revision due to pain and loosening,"[13] as well as several reports of "revision of [Optetrak] knee components due to tibial loosening,"[14] and "revision of [O]ptetrak knee components reportedly due [to] aseptic loosening."[15]

41.    This negative experience was not unique to U.S. patients. According to the 2020 Australian National Joint Replacement Registry, the rate of revision for a TKA utilizing an

---

[8] U.S. FOOD & DRUG ADMIN., MAUDE Adverse Event Report: EXACTECH, INC. OPTETRAK TIBIAL INSERT NONE (Oct. 24, 2012), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=2818479&pc=HSH.

[9] U.S. FOOD & DRUG ADMIN., MAUDE Adverse Event Report: EXACTECH INC. OPTETRAK KNEE SYSTEM (Aug. 15, 2011), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=2710707&pc=JWH.

[10] U.S. FOOD & DRUG ADMIN., MAUDE Adverse Event Report: EXACTECH, INC. OPTETRAK TIBIAL TRAY (Dec. 18, 2014), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=4365484&pc=JWH.

[11] U.S. FOOD & DRUG ADMIN.,MAUDE Adverse Event Report: EXACTECH INC. OPTETRAK LOGIC FIT TIBIAL TRAY, CEMENTED (Oct. 3, 2014), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=4285794&pc=JWH.

[12] U.S. FOOD & DRUG ADMIN., MAUDE Adverse Event Report: EXACTECH, INC. OPTETRAK TIBIAL INSERT – PS (Feb. 10, 2014), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/detail.cfm?mdrfoi__id=3641747&pc=JWH.

[13] U.S. FOOD & DRUG ADMIN., MAUDE Adverse Event Report: EXACTECH, INC. OPTETRAK HI-FLEX FEMORAL COMPONENT (Sep. 11, 2014), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=4177439&pc=HSA.

[14] U.S. FOOD & DRUG ADMIN., MAUDE Adverse Event Report: EXACTECH, INC. OPTETRAK THREE PEG PATELLA (Jan. 15, 2014), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/detail.cfm?mdrfoi__id=3597938&pc=HTG.

[15] U.S. FOOD & DRUG ADMIN., MAUDE Adverse Event Report: EXACTECH, INC. OPTETRAK KNEE SYS (Feb. 24, 2014), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/detail.cfm?mdrfoi__id=3660046&pc=JWH.

Optetrak tibial component with a OptetrakCR femoral component was 8.5% at ten (10) years and 10.2% at ten (10) years when implanted with a Optetrak-PS femoral component. [16]  Both rates far exceed international guidelines for acceptable revision rates.

42.     Not surprisingly, the Australian Orthopaedic Association has remarked that the Optetrak TKA Systems have a "higher-than-expected" rate of revision.[17]

43.     According to standards established by the International Benchmarking Working Group and applied by the Australian Orthopaedic Association, the Optetrak TKA Systems do not qualify for a "superiority benchmark" or even a "non-inferiority benchmark" because of its high failure rate.[18]

44.     Upon information and belief, it is widely recognized and accepted in the medical device industry that reported AERs represent only a small fraction of adverse events associated with and/or caused by a particular device.

45.     Despite Exactech's knowledge of early onset failures of its hip, knee, and ankle systems, Exactech continued to design, warrant, manufacture, promote, sell, and distribute them without alerting surgeons or patients of their potential increased risks of early onset failures.

46.     Upon information and belief, Exactech never changed any labeling, marketing materials, or product inserts to adequately and accurately warn patients or doctors of the associated increased risks of early failure due to loosening or polyethylene wear.

---

[16] Australian Orthopaedic Association National Joint Replacement Registry Hip, Knee & Shoulder Arthroplasty ANNUAL REPORT 2020, at 99 tbl. TY2, https://aoanjrr. sahmri.com/documents/10180/689619/Hip%2C+Knee+%26+Shoulder+Arthroplasty+New/6a07 a3b8-8767-06cf-9069-d165dc9baca7.
[17] *Id* at 428-429 tbl. IP19.
[18] *Id* at 98-99 tbl. IP20.

47.    Upon information and belief, Exactech did, however, quietly—and without providing information or explanation for its decision to patients, doctors, or the general public—begin replacing the tibial trays of some Optetrak models.

### c.  *Recall of Knee and Ankle Replacement Systems*

48.    In August 2021, Exactech finally recalled a limited number of its TKA and TAA systems.

49.    On approximately August 30, 2021, Exactech notified distributors and sales representatives of the limited recall, in a letter entitled "URGENT MEDICAL DEVICE RECALL." In part, the letter clarified that Exactech was "removing all Knee and Ankle UHMWPE products labeled with an 8-year shelf life and not packaged in EVOH/Nylon bags, in a phased approach over 12 months."[19]

50.    The actions and timing as to each phase were described as follows:

> **Phase 1:** immediately return all knee and ankle UHMWPE devices labeled with an 8-year shelf life that will be 5 years old or older by 08/31/2022 not packaged in EVOH/Nylon bags.

> **Phase 2:** between 05/31/2022 to 08/31/2022, return[] all remaining knee and ankle UHMWPE devices labeled with an 8-year shelf life not packaged in EVOH/Nylon bags.[20]

51.    Notably, Exactech did not issue any communications to surgeons who had implanted Optetrak, Truliant, or Vantage Systems with a recalled polyethylene component, or to patients who had received an Optetrak, Truliant, or Vantage Systems with a recalled polyethylene component, until six months later, in February 2022.

---

[19] *See* U.S. FOOD &: DRUG ADMIN., *Class* 2 Device *Recall OPTETRAK Comprehensive* Knee *System* (Oct. 04, 2021), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=189266.
[20] *Id.*

52.    On February 7, 2022, Exactech issued an "Urgent Medical Device Correction" in

which it informed health care professionals that:

> After extensive testing, we have confirmed that most of our inserts
> manufactured since 2004 were packaged in out-of-specification
> (referred to hereafter as "non- conforming") vacuum bags that are
> oxygen resistant but do not contain a secondary barrier layer
> containing ethylene vinyl alcohol (EVOH) that further augments
> oxygen resistance. **The use of these non-conforming bags may**
> **enable increased oxygen diffusion to the UHMWPE (ultra-high**
> **molecular weight polyethylene) insert, resulting in increased**
> **oxidation of the material relative to inserts packaged with the**
> **specified additional oxygen barrier layer. Over time, oxidation**
> **can severely degrade the mechanical properties of conventional**
> **UHMWPE, which, in conjunction with other surgical factors,**
> **can lead to both accelerated wear debris production and bone**
> **loss, or component fatigue cracking/fracture, all leading to**
> **corrective revision surgery.**[21]

53.    The "Urgent Medical Device Correction" clarified that Exactech was expanding

its recall to include all knee arthroplasty polyethylene inserts packed in non-conforming bags

regardless of label or shelf life. The components subject to the recall now include:

- OPTETRAK®: All-polyethylene CR Tibial Components, All-polyethylene PS Tibial

  Components, CR Tibial Inserts, CR Slope Tibial Inserts, PS Tibial Inserts, HI-FLEX®

  PS Tibial Inserts;

- OPTETRAK Logic®: CR Tibial Inserts, CR Slope Tibial Inserts, CRC Tibial Inserts, PS

  Tibial Inserts, PSC Tibial Inserts, CC Tibial Inserts; and

---

[21] "Urgent Medical Device Correction" letter from Darin Johnson, Exactech, Inc. President and
CEO & Sharat Kusuma, MD, FAAOS, Exactech, Inc. Senior VP, and Chief Med. Officer (Feb.
7, 2022) (emphasis in original), https://gwick42bmpq1joaxl1a0cctp-wpengine.netdna-
ssl.com/wp-content/uploads/Exactech-DHCP-letter.02.07.2022.pdf (emphasis in original).

- TRULIANT®: CR Tibial Inserts, CR Slope Tibial Inserts, CRC Tibial Inserts, PS Tibial Inserts, PSC Tibial Inserts; and VANTAGE Fixed-Bearing Liner Components.[22]

54.     In its February 7, 2022 correspondence, Exactech advised surgeons that revision surgery should be considered for patients who exhibited symptoms consistent with premature polyethylene wear.[23]

55.     According to Exactech, all its inserts manufactured after 2004 were packaged in non-conforming vacuum that did not include a necessary secondary liner comprised of ethylene vinyl alcohol (EVOH). The purpose of EVOH is to bolster the device's resistance to oxygen. Accordingly, the devices began oxidizing in their containers, prior to implantation.[24]

56.     More than 140,000 knee and ankle inserts implanted in the United States since 2004 were packaged improperly and subject to premature oxidation before they were ever unpacked, let alone implanted.[25]

**B.  Hip Liners**

   **a.  *Exactech's False and Misleading Claims***

57.     In addition to its knee and ankle device recalls, Exactech has experienced similar problems with its hip replacement devices.

58.     Beginning in 2005, Defendants began to market a new generation of "enhanced" UHMWPE products.

59.     This generation of products included the GXL acetabular liners with "enhanced" UHMWPE for use in a variety of hip systems. For example, in 2005 Defendants marketed their

---

[22] *Id.* at 1.
[23] *Id.* at 3.
[24] *Id.* at 2.
[25] *See Id.* at 1.

AcuMatch A-Series "Connexion GXL Enhanced UHMWPE Acetabular Liner."[26] Further, in

2007, Defendants marketed their Novation Crown Cup and Liners, which they claimed also

utilized "enhanced" GXL liners.[27]

60.    To purportedly "enhance" the standard UHMWPE that Exactech had been using

in their previous liners, Exactech exposed the GXL liners to two treatments of gamma radiation

at 25kGy for each treatment.[28]

61.    Defendants claimed that these purportedly "enhanced" GXL liners were

"developed to create . . . a robust arthroplasty respecting the need for lower wear, sufficient

fracture toughness, and oxidation behavior to provide a lifelong implant for patients."[29]

62.    Defendants expressly represented that Connexion GXL enhanced polyethylene

acetabular liners provide a low wear rate."[30]

63.    Defendants expressly represented that "Connexion GXL liners are a result of

development programs that are advancing bearing surface technology *while focusing on

increasing the longevity of total hip prostheses*."[31]

---

[26] Exactech's Summary of Safety and Effectiveness, Exactech® AcuMatch® A-Series Enhanced Polyethylene Acetabular Liner, 510K application #K051556 (Aug. 26, 2005), and U.S. FOOD & DRUG ADMIN., Approval letter (Sep. 6, 2005), https://www.accessdata.fda.gov/cdrh_docs/pdf5/K051556.pdf.
[27] Exactech's Novation Crown Cup™ and Liners Special 510(k) - 510(k) Summary of Safety and Effectiveness (Feb. 12, 2007), and U.S. FOOD & DRUG ADMIN., Approval letter (Mar. 15, 2007), https://www.accessdata.fda.gov/cdrh_docs/pdf7/K070479.pdf.
[28] Mattew J. Peterson, et al., Assessing the Long-Term Clinical Performance of Connexion GXL Polyethylene Acetabular Liners in Total Hip Arthroplasty 1 (Exactech, Inc. eds., 2017), https://content.exac.com/wp-content/uploads/sites/3/2018/09/046H_GXL_White_Paper_Web.pdf.
[29] *Id*.
[30] Exactech's Connexion GXL (May 11, 2008), http://www.exac.com/products/hip/acetabular-systems/connexion-gxl, [http://web.archive.org/web/20080511020837/http://www.exac.com/products/hip/acetabular-systems/connexion-gxl].
[31] *Id.*, (emphasis added)

15

64.    Defendants expressly represented that the GXL "provides a 59% wear reduction" over what it deemed was their "clinically successful" standard polyethylene liners.[32] [33]

65.    These representations plainly were intended to convince the public, including MSPRC and Class Members, that the GXL Liners not only were a safe and effective product for hip replacement, but that they were superior to products already on the market.

66.    In offering and selling the GXL Liners in the United States, Exactech represented that it complied with U.S. law and current good manufacturing practices, including 21 CFR 820.130, which requires "[e]ach manufacturer [to] ensure that device packaging and shipping containers are designed and constructed to protect the device from alteration or damage during the customary conditions of processing, storage, handling, and distribution."

67.    On information and belief, hospitals and surgeons had purchase agreements with Defendants that included express and implied warranties of merchantability. Plaintiff and Class Members, as ultimate purchasers of the Defective Devices, were intended or incidental third-party beneficiaries of those warranties.

68.    Further, on information and belief, Exactech rushed their "enhanced" UHMWPE products, including the GXL Liner, to market without any testing for safety or efficacy *in vivo*.

---

[32] Exactech's Connexion GXL® Polyethylene (May 25, 2008), http://www.exac.com/products/hip/emerging-technologies/connexion-gxl-polyethylene-[https://web.archive.org/web/20080525141228/http://www.exac.com/products/hip/emerging-technologies/connexion-gxl-polyethylene].
[33] Mattew J. Peterson, et al., Assessing the Long-Term Clinical Performance of Connexion GXL Polyethylene Acetabular Liners in Total Hip Arthroplasty 1 (Exactech, Inc. eds., 2017), https://content.exac.com/wp-content/uploads/sites/3/2018/09/046H_GXL_White_Paper_Web.pdf.

69.    Exactech applied for U.S. Food and Drug Administration ("FDA") clearance to market the Novation Crown Cup and GXL Liner under Section 510(k) of the Medical Device Amendment.

70.    Section 510(k) allows for the marketing of medical devices, so long as the medical device or material is deemed substantially equivalent to other legally marketed predicate devices or materials without predicate devices.

71.    In submitting the Novation Crown Cup and GXL Liner for 510(k) approval, Exactech represented that its products were "modifications of the previously cleared AcuMatch A-Series predicates" and "substantially equivalent" to them, including the "enhanced" GXL liners previously cleared on September 6, 2005, through the same 510(k) procedure.[34]

72.    Exactech further represented on its application to the FDA that "[e]ngineering evaluations were conducted to verify that the performance of the proposed acetabular components would be adequate for anticipated *in vivo* use."[35]

73.    Exactech obtained clearance by a 510(k) application on March 15, 2007.[36]

74.    Based on the 510(k)-clearance procedure, Exactech bypassed the requirement to have the Novation Crown Cup and GXL Liner independently evaluated by the FDA or its experts.

---

[34] Exactech's Summary of Safety and Effectiveness, Exactech® AcuMatch® A-Series Enhanced Polyethylene Acetabular Liner, 510K application #K051556 (Aug. 26, 2005), and U.S. FOOD & DRUG ADMIN., Approval letter (Sep. 6, 2005), https://www.accessdata.fda.gov/cdrh_docs/pdf5/K051556.pdf.

[35] *See* Exactech's Novation Crown Cup™ and Liners Special 510(k) - 510(k) Summary of Safety and Effectiveness (Feb. 12, 2007), and U.S. FOOD & DRUG ADMIN., Approval letter (Mar. 15, 2007), https://www.accessdata.fda.gov/cdrh_docs/pdf7/K070479.pdf.

[36] Exactech's Novation Crown Cup™ and Liners Special 510(k) - 510(k) Summary of Safety and Effectiveness (Feb. 12, 2007), and U.S. FOOD & DRUG ADMIN., Approval letter (Mar. 15, 2007), https://www.accessdata.fda.gov/cdrh_docs/pdf7/K070479.pdf.

### b. *Exactech Was Aware of Problems with its Hip Liners but Failed to Inform the Public*

75.     Exactech's claims that the "enhancements" to the UHMWPE in the GXL Liner improved wear resistance and longevity were (and are) false.

76.     In clinical use, the GXL Liner exhibits a higher-than-expected rate of polyethylene wear.

77.     In clinical use, the GXL Liner exhibits a higher-than-expected rate of failure, necessitating early revision surgery.

78.     The GXL Liner is defective because it leads to excessive wear, Osteolysis, and early implant failure.

79.     Shortly after introducing their "enhanced" UHMWPE products to the market, Exactech began receiving reports of adverse clinical outcomes due to wear and early revisions.

80.     Exactech's competitors' XLPE products, and even Defendants' previous UHMWPE products, performed significantly better clinically than Defendants' "enhanced" UHMWPE products.

81.     Surgeons and patients from the United States and around the world notified Defendants of adverse clinical outcomes with Exactech's "enhanced" UHMWPE products.

82.     Exactech failed to properly track and analyze these reports.

83.     When surgeons reported concerns due to failures from wear, Exactech responded by claiming that their "enhanced" UHMWPE products, including the GXL Liner, were

performing well and there was no cause for concern, despite Exactech's knowledge to the contrary.[37]

84.    The Federal Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Safe Medical Devices Act of 1990, requires manufacturers or importers of devices, as well as medical device user facilities, to report to the FDA deaths, serious illnesses, and injuries associated with medical devices.[38] Revision surgeries are considered a mandatory reportable concern that must be reported to the Center for Devices and Radiological Health ("CDRH") of the FDA,[39] which is responsible for issuing Safety Alerts, Public Health Advisories and Notices regarding medical devices.[40][41]

85.    Exactech failed to report deaths, serious illnesses, injuries and revision surgeries involving the GXL Liner to the FDA.

86.    As the number of failed GXL implants increased, case studies appeared in medical journals reporting that the failures were caused by excess polyethylene wear.

---

[37] Exactech "FREQUENTLY ASKED QUESTIONS (FAQs)" for US Agents & Surgeons, (GXL Liners for Novation, Acumatch and MCS systems, response to question 9) 2 (Jun. 24, 2021), https://www.exac.com/wp-content/uploads/2021/06/Frequently-Asked-Questions-FAQs-for-US-Agents-Surgeons_FINAL_GXL.pdf.

[38] *See* 21 U.S. Code § 360i; and 21 CFR 803 (MEDICAL DEVICE REPORTING); for manufacturers specially *see* 21 CFR §§ 803.50; CFR 803.52.

[39] Medical Device Reporting for Manufacturers Guidance for Industry and Food and Drug Administration Staff §4.2.4, 28 (Nov. 8, 2016), https://www.fda.gov/files/medical%20devices/published/Medical-Device-Reporting-for-Manufacturers---Guidance-for-Industry-and-Food-and-Drug-Administration-Staff.pdf.

[40] U.S. FOOD & DRUG ADMIN., Cent'r for Devices and Radiological Health (CDRH) website front page, https://www.fda.gov/about-fda/fda-organization/center-devices-and-radiological-health (last visited Aug. 31, 2022).

[41] Department of Health and Human Services OIG, ADVERSE EVENT REPORTING FOR MEDICAL DEVICES, OEI-01-08-00110, Executive Summary, Background i. (Oct. 2009), https://oig.hhs.gov/oei/reports/oei-01-08-00110.pdf.

87.     As will be detailed in the following section, Defendants made affirmative efforts to conceal the risk to the public from the excessive wear and early failure of their Hip Liners.

88.     Defendants knew or should have known about their Hip Liners' increased wear and early revisions soon enough to have promptly notified Class Members.

###     c.  *Recall of the Hip Liners*

89.     Despite all the information Defendants received regarding the failures of their Hip Liners, Defendants failed to recall the Hip Liners in a timely fashion.

90.     In 2019, Exactech released the "XLE Liner," a cross-linked polyethylene liner annealed and blended with vitamin E which has a lower wear rate than the GXL Liner. The XLE Liner is manufactured differently and subjected to a different, more thorough treatment than the GXL Liner. [42]

91.     Exactech's competitors have had cross-linked polyethylene liners, commonly abbreviated XLPE, available since the late 1990's. [43]

92.     Defendants claim that they transitioned GXL liners out of the U.S. market when the XLE was introduced in 2019. [44]

---

[42] *See* U.S. FOOD &: DRUG ADMIN., Approval letter (Mar. 12, 2018) and Exactech® Novation® and AcuMatch® E-HXL Acetabular Liners Traditional 510(k) - 510(k) Summary (Mar. 12, 2018) https://www.accessdata.fda.gov/cdrh_docs/pdf17/K173583.pdf
[43] *See* Letter "URGENT DEAR HEALTHCARE PROFESSIONAL COMMUNICATION" from Sharat Kusuma, MD, Exactech, Inc., Chief Med. Officer to Surgeons, Hospitals & Health care professionals (Exactech Connexion GXL acetabular polyethylene liners) (Jun. 28, 2021), https://www.exac.com/wp-content/uploads/2021/06/DHCP-Letter_Final-_for-Website_GXL.pdf.
[44] Exactech "FREQUENTLY ASKED QUESTIONS (FAQs)", to US Agents & Surgeons, (GXL Liners for Novation, Acumatch and MCS systems, response to question 2) 1 (Jun. 24, 2021), https://www.exac.com/wp-content/uploads/2021/06/Frequently-Asked-Questions-FAQs-for-US-Agents-Surgeons_FINAL_GXL.pdf

93.    Defendants failed to inform the public regarding the known, premature wear issues with their GXL Liner until it was transitioned out of the market and their XLE replacement was transitioned into the market.

94.    On June 24, 2021, Exactech finally issued a "Frequently Asked Questions"[45] document addressed to agents and surgeons admitting that Exactech was aware of a "higher risk of premature wear" with the GXL Liner.[46]

95.    Defendants then recommended that surgeons consider revising failing GXL liners and replacing them with Defendants' XLE liners, which are fully compatible replacements.[47]

96.    In the same document, Exactech stated that it was "not recalling the GXL liner," because it "is considered safe and effective and performs as intended," and because Exactech had begun transitioning the GXL Liner out of the U.S market in favor of its newly approved XLE Liner in 2019, which was completed in June 2021. Defendants recommended that doctors contact their patients directly.[48]

97.    On June 28, 2021, Exactech issued an "URGENT DEAR HEALTHCARE PROFESSIONAL COMMUNICATION" to surgeons, hospitals, and health care professionals, informing doctors of Exactech's awareness of its GXL liners' problematic clinical performance, and again recommending that surgeons replace the failing GXL Liner with Defendants' XLE Liners.[49]

---

[45] *See id.*
[46] *See id.* (response to question 1).
[47] *See id.* (response to question 4).
[48] See *Id.*, (response to question 2 & 4).
[49] *See* Letter "URGENT DEAR HEALTHCARE PROFESSIONAL COMMUNICATION" from Sharat Kusuma, MD, Exactech, Inc., Chief Med. Officer to Surgeons, Hospitals & Health care professionals (Exactech Connexion GXL acetabular polyethylene liners) (Jun. 28, 2021), https://www.exac.com/wp-content/uploads/2021/06/DHCP-Letter_Final-_for-Website_GXL.pdf.

98.     Neither the "Frequently Asked Questions" of June 24, 2021, nor the June 28 , 2021 "URGENT DEAR HEALTHCARE PROFESSIONAL COMMUICATION," made any mention of any pending recalls.[50]

99.     One day later, on June 29, 2021, Exactech initiated a Class II recall for the GXL Liners by issuing an "URGENT MEDICAL DEVICE CORRECTION" letter addressed to the attention of Exactech Agents, Representatives, and Distributors in possession of affected products. [51] Exactech's stated reason for the recall was that it had become aware that there was a "[r]isk of edge-loading and premature prosthesis wear . . . in a specific subset of patients with certain implant configurations and surgical implant positioning."[52]

100.    Defendants' delay in informing the public of problems with their GXL Liner until *their own* marketable alternative was available demonstrated a conscious disregard for the safety of the public in favor of profit.

101.    On August 11, 2022, Exactech issued a new "URGENT DEAR HEALTHCARE PROFESSIONAL COMMUNICATION" to surgeons, hospitals, and health care professionals expanding the scope of its July 2021 recall. [53]

---

[50] *See Id.* at 4 §3 No. 7.
[51] *See* U.S. FOOD &: DRUG ADMIN., Class 2 Device Recall Exactech Connexion, (list of search retrieving the 22 recalls for multiple systems and serial numbers of Exactech Connexion GXL acetabular polyethylene liners) (Jul 22, 2021), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRES/res.cfm?start_search=1&event_id=88126&productdescriptiontxt=&productcode=&IVDProducts=&rootCauseText=&recallstatus=&centerclassificationtypetext=&recallnumber=&postdatefrom=&postdateto=&productshortreasontxt=&firmlegalnam=&PMA_510K_Num=&pnumber=&knumber=&PAGENUM=100).
[52] See *id*. (emphasis added)
[53] "URGENT DEAR HEALTHCARE PROFESSIONAL COMMUNICATION" Letter from Sharat Kusuma, MD, FAAOS, Exactech, Inc. Chief Med. Officer, to Surgeons, Hospitals, Health care professionals (Aug. 11, 2022), https://www.exac.com/wp-content/uploads/2022/08/US-DHCP-Letter_FINAL_8.09.2022_Hip.pdf.

102.    In the August 11, 20222 letter, Exactech attributed its GXL Liners' premature wear to an additional risk factor, the use of "non-conforming" packaging, which purportedly "increased oxygen diffusion to the polyethylene insert resulting in increased oxidation of the material,"[54] and expanded its recall to also include conventional ultra-high molecular weight polyethylene ("UHMWPE") acetabular liners, which also had been packaged in non-conforming vacuum bags.[55]

103.    Exactech claimed that it only recently became aware that there was an "additional risk factor" for its Hip Liners because they were packaged in a "non-conforming" manner.

104.    Exactech, however, was aware that its implants containing polyethylene were being packaged improperly, because Exactech previously had recalled its knee and ankle implants for the same reason.

## C. Exactech Acknowledges Legal Responsibility but Fails to Reimburse TPPs

105.    Exactech has acknowledged legal responsibility by for the Defective Devices by agreeing to reimburse individual patients for out-of-pocket expenses and costs incurred in relation to evaluation and treatment for revision surgery.[56] Exactech, however, has failed to reimburse Plaintiff or Class Members for the payments or reimbursement of payments made for the Defective Devices or for revision surgery.

106.    Medical device manufacturers such as Exactech have a legal duty to ensure that their medical products, devices, and components are safe and free of design, marketing, and manufacturing defects that could cause harm to patients who use the devices. Defendants

---

[54] *See Id*. at 1.
[55] *See Id*. at 2.

[56] https://www.exac.com/medical-professionals/recall-information/

breached that duty in this case.

## V.    EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

107.    MSPRC and Class Members' causes of action accrued on the date of the recall of the Defective Devices.

108.    Alternatively, any applicable statutes of limitations or prescriptive periods are equitably tolled because Exactech willfully, wantonly, or intentionally withheld information from Class Members and the public concerning the above-described, known and documented hazards associated with the Defective Devices.

109.    Exactech willfully, wantonly, or intentionally withheld safety-related warnings from Class Members and the public concerning the above-described, known and documented hazards associated with its Defective Devices.

110.    Exactech willfully, wantonly, or intentionally withheld instructions from Plaintiff, Plaintiff's assignor(s), healthcare providers, patients, and the public regarding how to identify, mitigate, or treat the above-described, known and documented hazards associated with the Defective Devices.

111.    Exactech willfully, wantonly, intentionally conspired, and acted in concert to ignore relevant safety concerns and deliberately not study the long-term safety and efficacy of its Defective Devices.

112.    Exactech failed to disclose a known defect in its design, packaging, or delivery of its Defective Devices, and instead affirmatively misrepresented that its TKA and TAA systems and Hip Liners were as safe as—or even "superior" to—other comparable systems and liners on the market.

113.    Due to the absence of any warning or other information by Exactech as to the

significant health and safety risks posed by its Defective Devices, MSPRC's assignors were

unaware that the devices were faulty and likely to prematurely fail.

114.    As a result of Defendants' misconduct and affirmative acts of concealment, any

applicable statutes of limitations affecting the rights of Plaintiff and Class  Members  has  been

tolled.  Plaintiff  and  Class  Members exercised reasonable diligence by, among other things,

promptly investigating and bringing the allegations contained herein.  Despite these or other

efforts, Plaintiff and Class Members were unable to discover, and could not reasonably have

discovered, the unlawful conduct alleged herein when it occurred or at any earlier time that would

have enabled this complaint to have been filed at an earlier date.

## VI.    CLASS ACTION ALLEGATIONS

115.    MSPRC brings this action individually and as a class action, pursuant to Fed. R.

Civ. P. 23(a) and 23(b)(3), and seeks to represent a Nationwide Class as defined below:

> All third-party payors in the United States and its territories and
> possession that paid any amount of money for a Defective Device
> that was manufactured, distributed, or sold by any Defendant.

116.    MSPRC alleges additional sub-classes for all third-party payors in each State,

territory, or possession—or combination(s) of States, territories, or possessions, to the extent

Class Members can be grouped together for purposes of class treatment—who paid any amount

of money for a Defective Device that was manufactured, distributed, or sold by any Defendant

(collectively, the "Subclasses").

117.     Collectively, the forgoing Nationwide Class and the Subclasses are referred to as

the "Class."

118.    Excluded from the Class are: (a) any judge or magistrate presiding over this

action, and members of their families; (b) Defendants and affiliated entities, and their employees,

officers, directors, and agents; (c) Defendants' legal representatives, assigns, and successors; and (d) all persons who properly execute and file a timely request for exclusion from any Court-approved class.

119.    MSPRC reserves the right to narrow or expand the foregoing class definition, or to create or modify subclasses as the Court deems necessary.

120.    MSPRC meets the prerequisites of Rule 23(a) to bring this action on behalf of the class.

121.    **Numerosity**: While the exact number of Class Members cannot be determined without discovery, the Class is reasonably believed to consist of hundreds or thousands of third-party payors nationwide. The Class Members are therefore so numerous that individual joinder of all of them is impracticable.

122.    **Existence and predominance of common questions of law and fact:** Common questions of law and fact exist as to all Class and Subclass Members and predominate over any questions affecting only individual Class and Subclass Members. These common legal and factual questions include, but are not limited to, the following:

  a.   Whether Defendants made express or implied warranties of "safeness" or "superiority" regarding their devices to Plaintiff and Class Members;

  b.   Whether Defendants' devices containing UHMWPE were defective;

  c.   Whether Defendants falsely claimed that their knee and ankle replacement system and Hip Liners were the same as or comparable to those of their competitors;

  d.   Whether Defendants' knee and ankle replacement system and Hip Liners were defective;

  e.   Whether Defendants affirmatively misrepresented or omitted material facts

26

regarding their compliance with FDA regulations;

    f.   Whether Plaintiff and other Class Members have been injured as a result of each Defendants' unlawful conduct, and the amount of their damages;

    g.   Whether a common damages model can calculate damages on a class-wide basis;

    h.   When Plaintiff's and Class Members' causes of action accrued; and

    i.   Whether Defendants fraudulently concealed Plaintiff's and Class Members' causes of action.

These and other questions of law or fact which are common to the Class and Subclass Members predominate over any questions affecting only individual members of the Class and Subclass.

123.    **Typicality**: MSPRC's claims are typical of Class Members' claims. MSPR and the Class Members all suffered the same type of economic harm. MSPRC has substantially the same interest in this matter as all other Class Members, and its claims arise out of the same set of facts and conduct as the claims of all other Class Members.

124.    **Adequacy of Representation**: MSPRC is committed to pursuing this action and has retained competent counsel experienced in products liability litigation, consumer fraud litigation, class actions, and federal court litigation. Accordingly, MSPRC and its counsel will fairly and adequately protect the interests of Class Members. MSPRC's claims are coincident with, and not antagonistic to, those of the other Class Members they seek to represent. MSPRC has no disabling conflicts with Class Members and will fairly and adequately represent the interests of Class Members.

125.    **Superiority:** Class treatment is superior to all other available means for the fair and efficient adjudication of this controversy. Although Class Members possess claims against

Exactech, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues would not be efficient, timely or proper. Judicial and party resources would be unnecessarily depleted by individual litigation. Joinder on an individual basis of thousands of claimants in one action would be impractical or impossible. Further, individualized rulings and judgments could result in inconsistent relief for similarly situated plaintiffs. MSPRC's counsel, highly experienced in products liability litigation, consumer fraud litigation, class actions, and federal court litigation, reasonably foresee little difficulty in the management of this case as a class action.

## COUNT I
## BREACH OF EXPRESS WARRANTY

126.    MSPRC realleges and incorporates by reference the allegations in paragraphs 1 through 125 as though fully set forth here.

127.    Defendants, through their officers, directors, agents, representatives, written literature and packaging, written and media advertisements, and representations made to obtain FDA approval of the Defective Devices, expressly warranted that their devices were safe and even superior to other comparable systems or liners, would not prematurely fail, and did not create the risk of or produce dangerous side effects, including, but not limited to, severe pain and revision surgery.

128.    At the time Defendants made these express warranties, they knew or should have known that their Defective Devices did not conform to the express warranties and representations. In fact, Defendants knew or should have known that their Defective Devices would prematurely fail and exacerbate the risk of severe pain and revision surgery. Defendants

failed to accurately or adequately warn Plaintiff's assignors, Class Members, or the general public of the Defective Devices' failure to conform to Defendants' express warranties.

129.    The Defective Devices did not conform to Defendants' express representations and warranties because the Defective Devices were prone to premature failure, were unreasonably dangerous, and posed a risk of serious injury, including severe pain and revision surgery.

130.    Defendants breached their express warranties because the Defective Devices failed to conform to Defendants' express warranties and were unreasonably dangerous and contained latent defects, as set forth in more detail above.

131.    Plaintiff and the Class Members reasonably relied on Defendants' express warranties regarding the safety and efficacy of the Defective Devices in paying for or reimbursing payment for the Defective Devices.

132.    If Plaintiff and Class Members had known the Defective Devices did not conform to Defendants' express warranties, they would not have paid for or reimbursed payment for them.

133.    To the extent privity may be required, Plaintiff and the Class can establish privity with Exactech, or alternatively, can satisfy an exception to any privity requirement. Plaintiff and the Class reasonably relied on Exactech's express warranties and dealt directly with Exactech through the exchange of warranty and recall information.

134.    Alternatively, Plaintiff and the Class were foreseeable third-party beneficiaries of Exactech's sale of the Defective Devices.

135.    Plaintiff was not required to give notice to Exactech, a remote manufacturer, and Exactech has had notice of the type and source of claims in this matter since 2012. As a direct

and proximate result of Exactech's breach of its express warranties, Plaintiff and the Class have sustained damages in an amount to be determined at trial.

136.    To the extent that any pre-suit notice was purportedly required, Plaintiff has complied or substantially complied with all applicable notice requirements or is otherwise excused from compliance for this proceeding. Defendants have had notice of its violations for over a year. In addition, at a minimum, on October 13, 2022, Plaintiff sent Defendants a letter complying with any required pre-suit notification requirements. The letter put Defendants on notice of the demands of Plaintiff and the Class Members, and Defendants' responses made clear that Defendants refuse to provide appropriate warranty relief notwithstanding the unreasonable risks of using the Defective Devices. Plaintiff and the Class reasonably expected, at the time of payment, that the Defective Devices were safe for their ordinary and intended use.

137.    As a direct and proximate result of Defendants' breaches of express warranties, Plaintiff and other Class Members have been injured and suffered economic loss.

## <u>COUNT II</u>
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

138.    MSPRC realleges and incorporates by reference the allegations in paragraphs 1 through 125 as though fully set forth here.

139.    The implied warranty of merchantability, contained in U.C.C. § 2-314, has been codified in each state. *See, e.g.*, Ala. Code § 7-2-314, *et seq.*; Alaska Stat. § 45.02.314, *et seq.*; Ariz. Rev. Stat. Ann. § 47-2314, *et seq.*; Ark. Code Ann. § 4-2-314, *et seq.*; Cal. Com. Code § 2314, *et seq.*; Colo. Rev. Stat. § 4-2-314, *et seq.*; Conn. Gen. Stat. Ann. § 42a-2-314, *et seq.*; Del. Code Ann. tit. 6, § 2-314, *et seq.*; D.C. Code Ann. § 28:2-314, *et seq.*; Fla. Stat. Ann. § 672.314, *et seq.*; O.C.G.A. § 11-2-314, *et seq.*; Haw. Rev. Stat. § 490:2-314, *et seq.*; Idaho Code § 28-2-

314, *et seq.*; Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, *et seq.*; Ind. Code Ann. § 26-1-2-314, *et seq.*; Iowa Code Ann. § 554.2314, *et seq.*; Kan. Stat. Ann. § 84-2-314, *et seq.*; Ky. Rev. Stat. Ann. § 355.2-314, *et seq.*; La. Civ. Code Ann. art. 2520, *et seq.*; Me. Rev. Stat. Ann. tit. 11, § 2-314, *et seq.*; Md. Code Ann., Com. Law § 2-314, *et seq.*; Mass. Gen. Laws Ann. Ch. 106, § 2-314, *et seq.*; Mich. Comp. Laws Ann. § 440.2314, *et seq.*; Minn. Stat. Ann. § 336.2-314, *et seq.*; Miss. Code Ann. § 75-2-314, *et seq.*; Mo. Rev. Stat. § 400.2-314, *et seq.*; Mont. Code Ann. § 30-2-314, *et seq.*; Neb. Rev. Stat. § 2-314, *et seq.*; Nev. Rev. Stat. § 104.2314, *et seq.*; N.H. Rev. Stat. Ann. § 382-A:2-314, *et seq.*; N.J. Stat. Ann. § 12A:2-314, *et seq.*; N.M. Stat. Ann. § 55-2-314, *et seq.*; N.Y. U.C.C. Law § 2-314, *et seq.*; N.C. Gen. Stat. Ann. § 25-2-314, *et seq.*; N.D. Cent. Code § 41-02-31, *et seq.*; Ohio Rev. Code Ann. § 1302.27, *et seq.*; Okla. Stat. tit. 12A, § 2-314, *et seq.*; Or. Rev. Stat. § 72.3140, *et seq.*; 13 Pa. Stat. Ann. § 2314, *et seq.*; R.I. Gen. Laws § 6A-2-314, *et seq.*; S.C. Code Ann. § 36-2-314, *et seq.*; S.D. Codified Laws § 57A-2-314, *et seq.*; Tenn. Code Ann. § 47-2-314, *et seq.*; Tex. Bus. & Com. Code § 2.314, *et seq.*; Utah Code Ann. § 70A-2-314, *et seq.*; Va. Code Ann. § 8.2-314, *et seq.*; Vt. Stat. Ann. tit. 9A, § 2-314, *et seq.*; Wash. Rev. Code § 62A.2-314, *et seq.*; W. Va. Code § 46-2-314, *et seq.*; Wis. Stat. Ann. § 402.314, *et seq.*; and Wyo. Stat. Ann. § 34.1-2-314, *et seq.*

140.    The Defective Devices constituted "goods" or the equivalent within the meaning of the above statutes.

141.    Defendants had a duty to provide Plaintiff and other Class Members with merchantable devices that were fit for their intended purpose and conformed to the standards of the trade in which Defendants are involved such that the devices were of fit and merchantable quality.

142.    At all times relevant to this action, Defendants manufactured, marketed, described, distributed, recommended, merchandised, advertised, promoted, and sold the Defective Devices for knee, ankle, and hip replacement.

143.    Defendants knew of the intended use of the Defective Devices at the time they marketed, distributed and sold the Defective Devices, and impliedly warranted that the Defective Devices were of merchantable quality and safe and fit for their intended use.

144.    Defendants breach their implied warranties because the Defective Devices were not of merchantable quality, nor fit for their intended and ordinary purpose, and did not conform to the standards generally applicable to such goods.

145.    If Plaintiff and the Class had known the Defective Devices were not of merchantable quality, nor fit for their intended and ordinary purpose, and did not conform to the standards generally applicable to such goods, Plaintiff and the Class would not have purchased them.

146.    To the extent privity may be required, Plaintiff and the Class can establish privity with Exactech, or alternatively, Plaintiff can satisfy an exception to any privity requirement. Plaintiff and the Class reasonably relied on Exactech's warranties and dealt directly with Exactech through the exchange of warranty and recall information.

147.    Alternatively, Plaintiff and the Class were foreseeable third-party beneficiaries of Exactech's sale of the Defective Devices.

148.    Plaintiff is not required to give notice to Exactech, a remote manufacturer, and Exactech has had notice of the type and source of claims in this matter since 2012.

149.    To the extent that any pre-suit notice was purportedly required, Plaintiff has complied or substantially complied with all applicable notice requirements or is otherwise

excused from compliance for this proceeding. Defendants have had notice of its violations for over a year. In addition, at a minimum, on October 13, 2022, Plaintiff sent Defendants a letter complying with any required pre-suit notification requirements. The letter put Defendants on notice of the demands of Plaintiff and the Class Members, and Defendants' responses made clear that Defendants refuse to provide appropriate warranty relief notwithstanding the risks of using the Defective Devices. Plaintiff and the Class reasonably expected, at the time of purchase, that the Defective Devices were both merchantable and safe for their ordinary and intended use.

150.    As a direct and proximate result of Philips' breach of the implied warranties of merchantability and fitness, Plaintiff and the Class have sustained damages in an amount to be determined at trial.

## <u>COUNT III</u>
## VIOLATIONS OF MAGNUSON-MOSS FEDERAL WARANTY ACT
## 15  U.S.C. § 2301, *et seq.*

151.    MSPRC realleges and incorporates by reference the allegations in paragraphs 1 through 125 as though fully set forth here.

152.    The Defective Devices constitute "consumer products" as defined in 15 U.S.C**.** § 2301(1).

153.    The Defectives Devices are tangible personal property paid for by Plaintiff and the Class Members.

154.    The Defective Devices were distributed in commerce.

155.    The Defective Devices are normally used for personal purposes in that they are medical devices that are implanted into a person's body. This is a personal purpose because it is a purposed related to the person or body.

156.    Plaintiff and Class Members are "consumers" as defined in 15 U.S.C. § 2301(3).

157.    Plaintiff and the Class Members are buyers of the Defective Devices, or are persons to whom the Defective Devices were transferred during the duration of implied and written warranties applicable to the Defective Devices, or are persons entitled by the terms of those warranties, and by applicable State law, to enforce against Defendants the obligations of the warranties.

158.    Defendants are "suppliers" of the Defective Devices as defined in 15 U.S.C. § 2301(4).

159.    Defendants are or were engaged in the business of making the Defective Devices, which are consumer products, and of making other consumer products, directly or indirectly available to consumers, including through its subsidiaries and third-party distributors.

160.    Defendants are "warrantors" as defined in 15 U.S.C. § 2301(5).

161.    Defendants are suppliers or other persons: (a) who gave or offered to give a written warranty applicable to the Defective Devices; or (b) who are or may be obligated under an implied warranty applicable to the Defective Devices.

162.    As shown above, Defendants made express and implied warranties to Plaintiff and Class Members with respect to the Defective Devices.

163.    The warranties made by Defendants pertained to consumer products costing the consumer more than five dollars, *see* 15 U.S.C. § 2302(e).

164.    The Defective Devices were defective when they came off Exactech's assembly lines and at all subsequent times (including at the times of sale and delivery to Plaintiff and the Class Members) because the defective design and manufacturing made the Defective Devices prematurely wear making them dangerously unsafe.

165.    As a result, the Defective Devices were worth nothing at the time of their sales.

166.    Plaintiff and Class members would not have paid for or reimbursed payment for the Defective Devices had they known the Defective Devices were dangerously defective.

167.    Defendants violated the Magnuson-Moss Federal Warranty Act by failing to comply with express warranties they made to Plaintiff and the Class Members through labeling, marketing, promotional materials, packaging, and advertising. Defendants also violated the Magnuson-Moss Federal Warranty Act by failing to comply with the implied warranties they made to Plaintiff and the Class Members.

168.    Plaintiff and the Class Members need not have given notice of the defects to Defendants and an opportunity for Defendants to comply with their warranty obligations prior to the filing of this suit because Plaintiff may give such notice to Defendants on their own behalf and on behalf of the Class after class certification pursuant to 15 U.S.C. § 2310(e).

169.    Based on the facts alleged here, any durational limit to the warranties that would otherwise bar the Magnuson-Moss Federal Warranty Act claim in this Court are procedurally and substantively unconscionable and otherwise unenforceable under federal law and applicable state common law.

170.    Based on the facts alleged here, any durational limit to the warranties that would otherwise bar the claims in this Court is tolled under equitable doctrines.

171.    Plaintiff and the Class Members sustained injuries and damages as a proximate result of Defendants' violation of its express and implies warranties, and are entitled to legal and equitable relief against Defendants, including compensatory damages consisting of: the difference between the value of Defective Devices as warranted (their prices) and their actual values at the time of purchase or lease ($0.00) and the cost to replace the Defective Devices, including revision surgery; and recission or other miscellaneous incidental and consequential damages. In addition,

pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to reasonably have been incurred by them in connection with the commencement and prosecution of this action.

## COUNT IV
## FRAUDULENT MISREPRESENTATION

172.    MSPRC realleges and incorporates by reference the allegations in paragraphs 1 through 125 as though fully set forth here.

173.    Defendants misrepresented material facts regarding the Defective Devices, including making the fundamental, overarching misrepresentation that the devices were safe and effective.

174.    Defendants failed to advise Plaintiff and the Class of the material fact that the Defective Devices contained failing components and posed serious health risks to users and misrepresented that the Defective Devices were safe for use.

175.    Defendants had a duty to disclose to Plaintiff and the Class Members the serious health risks posed to users because: (a) Defendants were in a superior position to Plaintiff and the Class Members to know the risks associated with the use of the Defective Devices; (b) Defendants were in a superior bargaining position to Plaintiff and the Class Members in determining whether or not to disclose or conceal information regarding the Defective Devices in their packaging, labels, advertising, and websites; (c) Defendants made representations regarding the safety of the Defective Devices and had a duty to fully disclose all material facts regarding the serious health risks to users posed by the Defective Devices, as soon as Defendants became aware of those serious health risks; (d) Defendants knew that the Plaintiff and the Class

36

Members could not reasonably have been expected to learn or discover the serious health risks posed by use of the Defective Devices prior to purchasing the Defective Devices, given Defendants' representations, concealment of material information, and material omissions in their packaging, labels, advertising, and websites; and (e) Defendants had (and have) a duty to disclose information regarding the health and safety of their products.

176.    Defendants knowingly or recklessly allowed their packaging, labels, advertisements, promotional materials, and websites to mislead Plaintiff and the Class Members into reasonably believing that the Defective Devices were safe for use.

177.    Defendants knowingly or recklessly made false representations to the FDA in the approval process, misleading Plaintiff and the Class Members to believe that the Defective Devices were safe for use and complied with US laws and CGMP. Defendants knew that their omissions, concealment, and representations in their packaging, labels, advertisements, promotional materials, and websites regarding the Defective Devices were false, deceptive, inadequate, and materially misleading, and that the Defective Devices were unreasonably dangerous and posed an unreasonable risk of serious personal injury to the user.

178.    Defendants misrepresented and concealed from Plaintiff and the Class material information regarding the serious health risks posed to users of the Defective Devices by failing to include material information in their packaging, labels, advertisements, promotional materials, and websites.

179.    The information that Defendants failed to disclose and concealed from Plaintiff and the Class Members was material, because a reasonable TPP would find information regarding serious adverse health risks associated with the use of the Defective Devices important when deciding whether to pay for or reimburse purchases of the Defective Devices.

37

180.    As a result of Defendants' material misrepresentations, omissions, and deceptive packaging, labels, advertisements, promotional materials and websites, Plaintiff and the Class Members justifiably and reasonably believed that the Defective Devices were safe for use.

181.    Defendants intentionally, knowingly or recklessly made these material misrepresentations and omissions, and concealed material information regarding the adverse health risks associated with the Defective Devices in their packaging, labels, advertisements, promotional materials, and websites, to induce Plaintiff and the Class Members to pay for or reimburse purchases of the Defective Devices.

182.    Plaintiff and the Class Members relied on Defendants' deceptive packaging, labels, advertisements, promotional materials, websites, and representations made to obtain FDA approval, and paid for or reimbursed purchases of the Defective Devices to their detriment. Given the deceptive manner in which Defendants advertised, represented, and promoted the Defective Devices, Plaintiff's and the Class Members' reliance was reasonable and justified.

183.    But for Defendants' misrepresentations and omissions, Plaintiff and the Class Members would not have paid for or reimbursed purchases of the Defective Devices.

184.    As a direct and proximate result of Defendants' material misrepresentations, omissions, and concealment of material facts regarding the unreasonable health risks posed by the Defective Devices, Plaintiff and Class Members were damaged, in amounts to be proven at trial.

## COUNT V
## UNJUST ENRICHMENT

185.    MSPRC realleges and incorporates by reference the allegations in paragraphs 1 through 125 as though fully set forth here.

186.    Plaintiff and the Class Members conferred on Defendants a tangible and material economic benefit by paying for or reimbursing purchases of the Defective Devices. Plaintiff and Class Members would not have purchased or paid for the Defective Devices if they had known that the devices were defective.

187.    Defendants readily accepted and retained these benefits. Defendants profited from the sale of the Defective Devices to the detriment of Plaintiff and the Class Members.

188.    Defendants appreciated the economic benefits conferred on them by Plaintiff and the Class Members. Those benefits were the expected result of Defendants acting in their pecuniary interests to the detriment of their customers. Defendants knew of these benefits because they were aware of the defective nature of the Defective Devices but failed to disclose their knowledge of the defective nature of the devices, and thereby misled Plaintiff and Class Members regarding the nature and quality of the Defective Devices while profiting from this deception.

189.    In these circumstances, it would be unjust, inequitable, and unconscionable for Defendants to retain the economic benefits they received at the expense of Plaintiff and the Class Members, which Defendants procured and obtained through and as a result of their wrongful conduct alleged above.

190.    Plaintiff and the Class Members have a right to disgorgement and restitution of the benefits Defendants unjustly obtained and retained, together with such amounts as are necessary to return Plaintiff and Class Members to the position they were in prior to dealing with Defendants.

**COUNT VI**
**VIOLATION OF FLA. STAT. § 501.201**

191.    MSPRC realleges and incorporates by reference the allegations in paragraphs 1 through 125 as though fully set forth here.

192.    As alleged above, Defendants conducted and directed a home-office consumer fraud from their headquarters in Florida, which they conducted, directed, and aimed in a uniform manner at consumers throughout the United States, including Plaintiff and Class Members.

193.    Defendants' consumer fraud violated Fla. Stat. § 501.201 ("FDUTPA"), and injured Plaintiff and each Class Member in the same manner. Defendants' conduct constitutes trade or commerce or other actionable activity within the meaning of FDUTPA.

194.    Plaintiff and other Class Members are consumers or persons aggrieved by Defendants' misconduct under FDUTPA.

195.    To the extent applicable, Defendants knew, had reason to know, or should have known that their fraudulent and deceptive acts, omissions, or concealment would induce reasonable reliance, which can be presumed in the circumstances. As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and Class Members have suffered damages, i.e., an ascertainable, economic loss.

196.    Prior to initiating recalls in the United States, Defendants had actual or constructive knowledge of the risks posed by the UHMWPE used in the Defective Devices as a result of industry regulatory guidelines, reported concerns, and revisionary surgeries. But each Defendant intentionally, recklessly, or negligently disregarded that knowledge in making material representations that were false or deceptive about the Defective Devices, namely that the Defective Devices were safe and effective.

40

197.    As a proximate result of Defendants' violations of FDUTPA, Plaintiff and the

Class Members have suffered damages, in amounts to be proven at trial.

<u>COUNT VII</u>
**VIOLATIONS OF STATE CONSUMER PROTECTION LAWS**

198.    MSPRC realleges and incorporates by reference the allegations in paragraphs 1

through 125 as though fully set forth here.

199.    In the event that the Court were to hold that FDUTPA is not applicable to the

consumer protection claims of all Class Members, Plaintiff alternatively alleges that Defendants

have engaged in unfair competition or unfair or deceptive acts or practices in violation of the

following State consumer protection statutes:

      a.  Ala. Code § 8-19-1, *et seq.*;

      b.  Alaska Stat. § 45.50.471, *et seq.*;

      c.  Arizona Rev. Stat. § 44-1522, *et seq.*;

      d.  Ark. Code § 4-88-101, *et seq.*;

      e.  Cal. Bus. & Prof. Code § 17200, *et seq.*;

      f.  Cal. Civ. Code §§ 1750, *et seq.*;

      g.  Cal. Bus. & Prof. Code §§ 1750, *et seq.*

      h.  Colo. Rev. Stat. § 6-1- 105, *et seq.*;

      i.  Conn. Gen. Stat. § 42- 110b, *et seq.*;

      j.  6 Del. Code § 2511, *et seq.*;

      k.  D.C. Code § 28-3901, *et seq.*;

      l.  Fla. Stat. § 501.201, *et seq.*;

      m.  Ga. State 10-1-392, *et seq.*;

n.   Haw. Rev. Stat. § 480, *et seq.*;

o.   Idaho Code § 48-601, *et seq.*;

p.   815 ILCS 505/1, *et seq.*;

q.   Ind. Code Ann. § 24-5- 0.5.1, *et seq.*;

r.   Iowa Code Ann. §714H, *et seq.*;

s.   Kan. Stat. § 50-623, *et seq.*;

t.   Ky. Rev. Stat. § 367.110, *et seq.*;

u.   La. Rev. Stat. § 51:1401, *et seq.*;

v.   5 Me. Rev. Stat. § 207, *et seq.*;

w.  Md. Com. Law Code § 13-101, *et seq.*;

x.   Mass. Gen. L. Ch. 93A, *et seq.*;

y.   Mich. Stat. § 445.901, *et seq.*;

z.   Minn. Stat. § 325F.67, *et seq.*;

aa. Miss. Code Ann. § 75- 24-1, *et seq.*;

bb. Vernon's Mo. Rev. Stat. § 407.0 10, *et seq.*;

cc. Mont. Code § 30-14- 101, *et seq.*;

dd. Neb. Rev. Stat. § 59- 1601, *et seq.*;

ee. Nev. Rev. Stat. § 598.0903, *et seq.*;

ff.  N.H. Rev. Stat. § 358- A:1, *et seq.*;

gg. N.J. Stat. Ann. § 56:8- 1, *et seq.*;

hh. N.M. Stat. Ann. § 57- 12-1, *et seq.*;

ii.  N.Y. Gen. Bus. Law § 349, *et seq.*;

jj.  N.Y. Gen. Bus. Law § 350, et seq.;

kk. N.C. Gen. Stat. § 75- 1.1, *et seq.*;

ll.  N.D. Cent. Code § 51- 15-01, *et seq.*;

mm.  Ohio Rev. Stat. § 1345.01, *et seq.*

nn. Okla. Stat. tit. 15 § 751, *et seq.*;

oo. Or. Rev. Stat. § 646.605, *et seq.*;

pp. 73 Pa. Stat. § 201-1, *et seq.*;

qq. R.I. Gen. Laws § 6-13.1- 1, *et seq.*;

rr.  S.C. Code Laws § 39- 5-10, *et seq.*;

ss.  S.D. Code Laws § 37- 24-1, *et seq.*;

tt.   Tenn. Code § 47-18- 101, *et seq.*;

uu. Tex. Bus. & Com. Code § 17.41, *et seq.*;

vv. Utah Code Ann. § 13- 11-1, *et seq.*;

ww. Vt. Stat. Ann. Tit. 9, § 2451, *et seq.*;

xx. Va. Code § 59.1-196, *et seq.*;

yy. Wash. Rev. Code § 19.86.010, *et seq.*;

zz.  W. Va. Code § 46A-6-101, *et seq.*;

aaa. Wis. Stat. § 100.20, *et seq.*;

bbb. Wyo. Stat. § 40-12-100, *et seq.*; and

ccc. 23 L.P.R.A. § 1001, *et seq.*, the applicable statute for the Commonwealth of Puerto Rico.

200.    Plaintiff and the Class members paid for or reimbursed payment for the Defective Devices for personal purposes.

201.    Defendants marketed and advertised the Defective Devices to physicians, surgeons, and other health care entities in each above-listed jurisdiction. Defendant, among other things, sold the Defective Devices in each jurisdiction, shipped the Defective Devices in each jurisdiction, and otherwise engaged in trade or commerce, or conducted business, related to the Defective Devices in each jurisdiction.

202.    Defendants concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication that the Defective Devices were defective and would expose users to risks. These unfair business acts or practices presented a threat and likelihood of confusion, misunderstanding, harm, and deception. Prior to initiating recalls in the United States, Defendants had actual or constructive knowledge about the risks posed by the UHMWPE used in the Defective Devices as a result of industry regulatory guidelines, reported concerns, and revisionary surgeries. But each Defendant intentionally, recklessly, or negligently disregarded that knowledge in making material misrepresentations that were false or deceptive about the Defective Devices, namely that the Defective Devices were safe and effective.

203.    Defendants conduct constituted, among other things, the following prohibited fraudulent, deceptive, unconscionable, and unfair business practices: (a) misrepresenting that the Defective Devices have characteristics, ingredients, uses, or benefits, which they do not have; (b) misrepresenting that the Defective Devices are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) engaging in fraudulent and deceptive conduct that creates a likelihood of confusion and misunderstanding.

204.    Defendants' conduct was fraudulent, deceptive, and unconscionable because the omissions created a likelihood of confusion and misunderstanding and had the capacity or

tendency to deceive and, in fact, did deceive Plaintiff. Ordinary consumers, including Plaintiff and other Class Members, would have found it material to their decision to pay for or reimburse payment for the Defective Devices that that the Defective Devices were prone to premature wear and subjected users to potential serious health consequences. Knowledge of those facts would have been a substantial factor in Plaintiff's, as well as other Class Members', decision to pay for or reimburse payment for the Defective Devices.

205.    Defendants owed Plaintiff and other Class Members a duty to disclose these facts because: they were known to or accessible exclusively to Defendants, who had exclusive and superior knowledge of the facts; the facts would be material to a reasonable consumer; Defendants actively concealed them; Defendants intended for consumers to rely on the omissions in question; and the Defective Devices pose an unreasonable rick of substantial bodily injury.

206.    To the extent applicable, Defendants knew, intended, or should have known that their fraudulent and deceptive acts, omissions, or concealment would induce reliance and that reliance can be presumed under the circumstances. As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and Class Members have suffered damages – an ascertainable loss – in amounts to be proven at trial.

207.    Plaintiff and Class Members justifiably relied on the material representations and omissions by Defendants, and reasonable consumers would have been expected to rely upon these representations and omissions, in part, because they are representations and omissions that impact seriously on a consumer's health and well-being.

208.    Defendants' conduct actually and proximately caused an ascertainable loss of money or property to Plaintiff and Class Members. Absent Defendants' misleading, deceptive and fraudulent conduct, Plaintiff and Class Members would have behaved differently and would

not have paid for or reimbursed payment for the Defective Devices and the costs and expenses of revisionary procedures.

209.    Accordingly, Plaintiff and the Class Members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are the difference between the values of the Defective Devices as represented (their prices paid) and their actual values at the time of payment or reimbursement of payment ($0.00), and the costs to replace the Defective Devices, including revision surgery, and other miscellaneous and consequential damages. In addition, given the nature of Defendants' conduct, Plaintiff and the Class Members are entitled to recover all available statutory, exemplary, treble, and punitive damages, costs of suit, and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary, and all such other relief the Court deems proper.

210.    To the extent that any pre-suit notice was purportedly required, Plaintiff has complied or substantially complied with all applicable notice requirements or is otherwise excused from compliance for this proceeding. Defendants have had notice of its violations for over a year. In addition, at a minimum, on October 13, 2022, Plaintiff sent Defendants a letter complying with any required pre-suit notification requirements. The letter put Defendants on notice of the demands of Plaintiff and the Class Members, and Defendants' responses made clear that Defendants refuse to acknowledge and cure the violations in a manner that would compensate Plaintiff and Class Members for all the economic losses they have suffered as a result of Defendants' misconduct. Defendants failed to remedy its unlawful conduct.

## COUNT VIII
### NEGLIGENCE

211.    MSPRC realleges and incorporated by reference the allegations in paragraph 1 through 125 as though fully set forth here.

212.    Defendants owed a duty to Plaintiff and the Class Members to ensure that the devices it sold in the United States were safe and not defective.

213.    Defendants owed a duty of care to Plaintiff and the Class because they were the foreseeable payers for purchases of the Defective Devices, and the foreseeable targets and victims of Defendants' unlawful conduct. Defendants knew or should have known that their Defective Devices were not safe and effective, that they posed an unreasonable risk of causing the injury and harm that they caused, including revision surgery, and Defendants were in the best position to discover, prevent, disclose and remedy those risks.

214.    Defendants failed to exercise reasonable care to discover, prevent, disclose and remedy the unreasonable risk of harm posed by the Defective Devices. Defendants inadequately oversaw the manufacture, packaging, sale, and marketing of the Defective Devices. Defendants knew that ignoring the manufacturing and packaging issues inherent in the Defective Devices would damage Plaintiff and the Class Members, while increasing Defendants' profits from sales of the Defective Devices.

215.    Defendants were required, but failed, to maintain a special relationship with Plaintiff and the Class Members, to ensure that their Defective Devices complied with all applicable laws and regulations, were not defective, and were safe.

216.    Defendants' misconduct created a foreseeable risk of harm to Plaintiff and the Class Members. As alleged above, Defendants' misconduct included, but was not limited to,

negligently failing to oversee the manufacture, packaging, sale and marketing of the Defective Devices, and allowing them to be introduced into the market, where they were purchased or paid for by Plaintiff and the Class members.

217.    Defendants breached duties owed to Plaintiff and Class Members by failing to exercise reasonable care to protect the interests of Plaintiff and the Class.

218.    Defendants, through their affirmative misconduct in introducing the Defective Devices into the stream of commerce, assumed a duty to ensure that their devices were manufactured, tested, packaged, sold, and marketed in a non-negligent manner. By affirmatively misrepresenting in their statements and disclosures that the Defective Devices were safe and effective, Defendants assumed a duty to exercise reasonable care in the distribution and sale of the Defective Devices.

219.    As the manufacturers and sellers of the Defective Devices, which were intended to treat and improve the lives of elder or arthritic patients, Defendants assumed the duty of a special relationship with Class Members by virtue of their superior knowledge and economic position regarding the true, defective nature of the Defective Devices.

220.    On information and belief, hospitals and surgeons had purchase agreements with Defendants, which included express and implied terms that the devices be merchantable, fit for their intended purpose, and not unreasonably dangerous and defective. Plaintiff and Class Members, as persons that purchased or paid for the Defective Devices, are intended or incidental third-party beneficiaries of such arrangements.

221.    As a direct and proximate result of Defendants' negligent conduct, Plaintiff and the Class Members suffered damages in amounts to be proven at trial.

<u>COUNT IX</u>
**STRICT LIABILITY – MANUFACTURING DEFECT**

222.    MSPRC realleges and incorporates by reference the allegations in paragraphs 1 through 125 as though fully set forth here.

223.    Defendants designed, developed, manufactured, marketed, distributed and sold the Defective Devices and placed them into the stream of commerce.

224.    The Defendants had a duty to manufacture the Defective Devices in a manner that prevents unreasonable risk of harm or injury to users and patients.

225.    The Defendants had a duty to distribute, market, and sell the Defective Devices without manufacturing and related packaging defects to prevent an unreasonable risk of harm or injury.

226.    The Defective Devices manufactured by Defendants were not reasonably safe as manufactured, packaged, distributed, marketed, or sold.

227.    The defects in manufacture of the Defective Devices were a substantial factor in causing Plaintiff's injuries.

228.    The Defective Devices were supplied in a defective condition in its manufacture, such that they would experience excessive and premature polyethylene wear, rendering them unreasonably dangerous. The Defects in manufacture include but are not limited to failure to properly package the polyethylene components of the Defective Devices to prevent the components from undergoing increased oxidation and causing premature polyethylene wear, component loosening, or other failure causing serious complications including tissue damage, osteolysis, and other injuries, as well as the need for revision surgery.

49

229.    Defendants knew or should have been aware that the Defective Devices were defectively manufactured.

230.    The manufacturing defects in the Defective Devices existed when the devices left the Defendants' control.

231.    Defendants expected the Defective Devices to reach Plaintiffs and Class Members without substantial change in their condition.

232.    Defendants knew or had reason to know that the Defective Devices caused an increased risk of harm to Plaintiff's assignors' enrollees, due to the devices' propensity to undergo substantial early polyethylene wear, component loosening, or other failure causing serious complications, including tissue damages, osteolysis, and other injury as well as the need for revision surgery in patients.

233.    Defendants are strictly liable for the defective nature of the Defective Devices, the distribution, manufacture, marketing, and sale of the defectively manufactured Defective Devices, and the injuries sustained by Plaintiff and the Class Members.

234.    As a direct and proximate result of the defective nature of the Defective Devices, Plaintiffs and Class Members expended money and will continue to expend money for the costs to replace the Defective Devices, the costs of revision surgery, and the costs of any associated medical treatments for Plaintiff's Assignors' enrollees' personal injuries. Plaintiffs and Class Members suffered damages in an amount to be proven at trial.

## COUNT X
## STRICT LIABILITY – DESIGN DEFECT

235.    MSPRC realleges and incorporates by reference the allegations in paragraphs 1 through 125 as though fully set forth here.

236.    Defendants designed, developed, manufactured, marketed, distributed and sold the Defective Devices and placed them into the stream of commerce.

237.    The Defendants had a duty to design and package the Defective Devices in a manner that prevents unreasonable risk of harm or injury to users and patients.

238.    The Defendants had a duty to distribute, market, and sell the Defective Devices with a design that did not present an unreasonable risk of harm or injury.

239.    The design of the Defective Devices and corresponding packaging is defective and not reasonably safe for its expected, intended, or foreseeable uses, functions, and purposes.

240.    The Defective Devices and corresponding packaging are not reasonably safe as designed, distributed, marketed, delivered or sold by Defendants.

241.    The defective design of the Defective Devices and packaging were a substantial factor in causing Plaintiff's injuries.

242.    The defects in the design of the Defective Devices and packaging include, but are not limited, to the Defective Devices having a propensity to undergo premature polyethylene wear, component loosening, or other failure causing serious complications including tissue damage, osteolysis, and other injuries, as well as the need for revision surgery.

243.    Defendants knew or should have been aware that the Defective Devices were defectively designed.

244.    The design defects in the Defective Devices and packaging existed when the devices left the Defendants' control.

245.    Defendants expected the Defective Devices to reach Plaintiffs and Class Members without substantial change in their condition.

246.    Defendants knew or had reason to know that the Defective Devices caused an increased risk of harm to Plaintiff's assignors and their enrollees, due to the devices' propensity to undergo substantial early polyethylene wear, component loosening, or other failure causing serious complications, including tissue damages, osteolysis, and other injury as well as the need for revision surgery in patients.

247.    Feasible safer alternative designs providing the same functional purpose were available to the Defendants at the time the Defective Devices were designed and packaged and offered for sale in the market.

248.    As a direct and proximate result of the defective nature of the Defective Devices, Plaintiffs and Class Members expended money and will continue to expend money for the costs to replace the Defective Devices, the costs of revision surgery, and the costs of any associated medical treatments for Plaintiff's Assignors' enrollees' personal injuries. Plaintiffs and Class Members suffered damages in an amount to be proven at trial.

## COUNT XI
## STRICT LIABILITY – FAILURE TO WARN

249.    MSPRC realleges and incorporates by reference the allegations in paragraphs 1 through 125 as though fully set forth here.

250.    Defendants designed, developed, manufactured, marketed, distributed and sold the Defective Devices and placed them into the stream of commerce.

251.    The Defendants had a duty to provide adequate warnings regarding the Defective Devices in a manner that did not present an unreasonable risk of harm or injury to users and patients.

252.    The Defendants had a duty to distribute, market, and sell the Defective Devices with adequate warnings that did not present an unreasonable risk of harm or injury.

253.    The warnings that accompanied the Defective Devices and corresponding packaging were defective thereby making the product not reasonably safe for its expected, intended, or foreseeable uses, functions, and purposes.

254.    The Defective Devices and corresponding packaging are not reasonably safe as labeled, distributed, marketed, or sold by Defendants.

255.    Inadequate labeling accompanying the Defective Devices and packaging was a substantial factor in causing Plaintiff's injuries.

256.    The Defective Devices were defective and unreasonably dangerous when they entered the stream of commerce and were received by Plaintiff, because the warnings in the instructions for use, operative techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications provided by Defendants or its salesforce to Plaintiffs, Class Members, physicians, surgeons, and patients with our about the Defective Devices failed to adequately convey the defects, potential risks, and side effects of the Defective Devices and the dangerous propensities of the devices, which risks were known or were reasonably scientifically knowable to Defendants.

257.    In particular, Defendants failed to adequately disclose the Defective Devices' propensity to undergo premature polyethylene wear, component loosening, or other failure causing serious complications including tissue damage, osteolysis, and other injuries, as well as the need for revision surgery.

258.    Defendants consciously disregarded the increased risks of harm by failing to adequately warn of such risks, unlawfully concealing the dangerous problems associated with

implantation of the Defective Devices, and continuing to market, promote, sell and defend the Defective Devices until the recent recalls.

259.    Defendants knew or should have been aware that the Defective Devices and packaging contained inadequate warnings.

260.    The inadequate warnings for the Defective Devices existed when the devices left Defendants' control.

261.    Defendants expected the Defective Devices to reach Plaintiffs and Class Members without substantial change in their condition.

262.    Defendants knew or had reason to know that the Defective Devices caused an increased risk of harm to Plaintiff's assignors' and their enrollees, due to the devices' propensity to undergo substantial early polyethylene wear, component loosening, or other failure causing serious complications, including tissue damages, osteolysis, and other injury as well as the need for revision surgery in patients.

263.    Defendants are strictly liable for providing inadequate warnings accompany the Defective Devices and packaging of the device, the distribution, marketing, and sale of the Defective Devices, and the injuries sustained by Plaintiff.

264.    As a direct and proximate result of the defective nature of the Defective Devices, Plaintiffs and Class Members expended money and will continue to expend money for the costs to replace the Defective Devices, the costs of revision surgery, and the costs of any associated medical treatments for Plaintiff's Assignors' enrollees' personal injuries. Plaintiffs and Class Members suffered damages in an amount to be proven at trial.

## <u>PRAYER FOR RELIEF</u>

For the foregoing reasons, Plaintiff seeks entry of the following judgment:

A.  An order certifying this action as a class action;

B.  An order appointing Plaintiff as Class Representative, and appointing undersigned counsel as Class Counsel to represent the Class;

C.  A declaration that Defendants are liable under each and every one of the above-enumerated causes of action;

D.  Payment to Plaintiff and Class Members of all damages, exemplary or punitive damages, and/or restitution associated with the conduct for all causes of action in amounts to be proven at trial, including but not limited to: the full amounts paid or reimbursed for the Defective Devices; the costs to replace the Defective Devices because of recalls; the costs of revision surgery; and the costs of any associated medical treatments;

E.  An award of reasonable attorneys' fees, expert witness fees, and costs, as provided by applicable law, from any recovery of monies or benefits for the Class Members;

F.  An award of statutory penalties to the extent available;

G.  Interest as provided by law, including but not limited to pre-judgment and post- judgment interest as provided by rule or statute; and

H.  Such other and further relief as this Court may deem just, equitable, or proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Dated: November 15, 2022

Respectfully submitted,

**RIVERO MESTRE LLP**
*Counsel for MSP*
2525 Ponce de León Blvd., Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Facsimile: (305) 445-2505
E-mail: jmestre@riveromestre.com
E-mail: arolnick@riveromestre.com
E-mail: zkass@riveromestre.com
E-mail: afernandez@riveromestre.com
Secondary: npuentes@riveromestre.com

/s/ *Jorge A. Mestre*
JORGE A. MESTRE
Florida Bar No. 088145

*/s/ Kristian Rasmussen*
KRISTIAN RASMUSSEN
Florida Bar. No. 0229430
**Milberg Coleman Bryson Phillips
Grossman, LLP**
*Counsel for MSP*
2701 S Le Jeune Rd. 10th Floor
Coral Gables, FL 33134
Email: Krasmussen@milberg.com
Phone: (786) 206-8306 ext. 5224